CHRISTINE NESTOR, Fla. Bar No. 597211
Email: nestorc@sec.gov
STEPHANIE N. MOOT, Fla. Bar No. 30377
Email: moots@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone:  (305) 982-6300
Facsimile: (305) 516-4154

LOCAL COUNSEL
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
U.S. Securities and Exchange Commission
444 S. Flower St., Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3398
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> BRETT PITTSENBARGAR and MGM HOME REMODELING LLC f/k/a BP FINANCIALS, LLC d/b/a BP FINANCIALS & TAX DESIGN GROUP, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

**JURISDICTION AND VENUE**

1.     The Commission brings this action pursuant to Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

2.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

3.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b)(2).

4.     The Woodbridge Group of Companies LLC and its affiliates ("Woodbridge") was headquartered and ran its operations in the Central District of California, specifically Sherman Oaks, California.  The Defendants transacted business in the Central District of California while participating in the offer and sale of Woodbridge's securities over the course of more than 4 years.  Among other things, the Defendants regularly communicated via telephone, email, text message, and mail with Woodbridge employees who were located in Sherman Oaks, California.  Additionally, Pittsenbargar met with Woodbridge executives in this District and from September until December 2017, Pittsenbargar was an employee of Woodbridge.

5.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or

1

instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

6.    The Defendants will, unless enjoined, continue to engage in the acts, practices, transactions and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## SUMMARY

7.    From at least November 2012 through December 2016, the Defendants raised approximately $18 million from the offer and sale of Woodbridge's securities from at least 45 investors located in at least four states. In return, the Defendants earned approximately $1 million in transaction-based sales commissions.

8.    The Defendants pitched Woodbridge's securities to the general public via email, telephone, the internet, at in-person meetings, and using other instruments of interstate commerce.  The Defendants provided investors with Woodbridge's sales materials touting Woodbridge's securities as "safe and secure."

9.    The Defendants also offered and sold securities in unregistered transactions through two funds Pittsenbargar controlled, Ironbridge Asset Fund, LLC ("Ironbridge Fund 1") and Ironbridge Asset Fund 2, LLC ("Ironbridge Fund 2," and, collectively with Ironbridge Fund 1, the "Ironbridge Funds"), which then invested in Woodbridge securities.

10.  Unbeknownst to the Defendants' clients, many of whom were elderly and had invested their retirement savings as a result of the Defendants' marketing techniques, Woodbridge was actually operating a massive Ponzi scheme, raising more than $1.2 billion before collapsing in December 2017 and filing a petition for bankruptcy.   Once Woodbridge filed for bankruptcy, investors stopped

1    receiving their monthly interest payments, and have not received a return of their

2    investment principal.

3        11.  At all relevant times, the Defendants held no securities licenses, were

4    not registered with the Commission, and were not associated with a registered

5    broker-dealer.  Further, neither Woodbridge's securities nor Ironbridge Funds'

6    securities were registered with the Commission nor did they qualify for an

7    exemption from registration.  Defendants were thus not permitted to sell

8    Woodbridge's securities or Ironbridge Funds' securities.

9

10                                  **FACTS**

11                             **The Defendants**

12       12.  **Brett Pittsenbargar** ("Pittsenbargar") is a resident of Austin, Texas,

13   and is the owner of MGM Home Remodeling LLC f/k/a BP Financials, LLC

14   d/b/a BP Financial & Tax Design Group ("BP Financials").  From at least

15   November 2012 to December 2016, Pittsenbargar personally solicited and sold

16   securities to investors located in at least four states.  On July 17, 2015, the Texas

17   Securities Commissioner entered an Emergency Cease and Desist Order against

18   Woodbridge and the Defendants (the "2015 TSSB Order").  Among other things,

19   the 2015 TSSB Order found that Pittsenbargar and BP Financials violated Texas

20   law by offering Woodbridge's securities in unregistered transactions and ordered

21   that they cease and desist from offering for sale any security in unregistered

22   transactions in Texas.  On January 5, 2017, Pittsenbargar and BP Financials

23   consented to the entry of an Order by the TSSB finding that they had violated the

24   Texas   broker-dealer   and   securities   registration   provisions   by   selling

25   Woodbridge's securities.  Pittsenbargar and BP Financials further agreed to cease

26   and desist from the offer or sale of any security in Texas. From September 2017

27   until December 2017, Pittsenbargar was employed by Woodbridge, purportedly in

28                                    3

a compliance function. Pittsenbargar is not and has never been registered as or associated with a registered broker-dealer.

13. **BP Financials** is a Texas limited liability company, wholly owned by Pittsenbargar, engaged in the business of selling investment products to retail investors. BP Financials is not and has never been registered as or associated with a registered broker-dealer.

## Other Relevant Entities and Individuals

14. **Woodbridge** is a Sherman Oaks, California-based financial company not registered with the Commission in any capacity with no publicly traded stock. Formed in 2012, Woodbridge had approximately 130 employees in offices in six states. On December 4, 2017, Woodbridge filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. *In re Woodbridge Group of Companies LLC, et al.,* Case No. 17-12560 (jointly administered) (Bankr. D. Del. Dec. 4, 2017).

15. **Robert H. Shapiro** ("Shapiro") was a resident of Sherman Oaks, California at all material times. He was Woodbridge's owner, President and CEO and, until the company's bankruptcy filing, maintained sole operational control over the company. In August 2019 Shapiro pled guilty to conspiracy to commit mail and wire fraud in connection with the Woodbridge Ponzi scheme, as well as tax evasion, and was subsequently sentenced to 25 years imprisonment. *United States v. Shapiro*, No. 1:19-cr-20178 (S.D. Fla.). He is currently in federal custody. Shapiro is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.

16. **Ironbridge Fund 1** is a Texas limited liability company formed on January 20, 2015. Pittsenbargar is the Managing Member of Ironbridge Fund 1. On February 19, 2015, Ironbridge Fund 1 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of

the Securities Act seeking to raise $5 million from investors.  Ironbridge Fund 1 invested in the securities of Woodbridge and another, now-defunct entity.

17. **Ironbridge Fund 2** is a Texas limited liability company formed on July 14, 2015.  Pittsenbargar is the Managing Member of Ironbridge Fund 2.  On July 20, 2015, Ironbridge Fund 2 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $20 million from investors.  Ironbridge Fund 2 invested in the securities of Woodbridge and another, now-defunct, entity. Pittsenbargar caused the Ironbridge Funds to purchase more than $6 million in Woodbridge securities on behalf of investors.

### Woodbridge Background

18. Beginning in July 2012 through at least December 4, 2017, Shapiro and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of securities to over 8,400 investors nationwide.  At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million.  Shapiro promised investors they would be repaid from the high rates of interest Woodbridge was earning on loans it was purportedly making to third-party borrowers.  However, nearly all the purported third-party borrowers were actually limited liability companies owned and controlled by Shapiro, which had no revenue, no bank accounts, and never paid any interest under the loans. The Defendants are responsible for raising approximately $18 million from approximately 45 investors.

### A. Woodbridge's Securities and Representations to Investors

19. Woodbridge sold investors two primary types of securities:  (1) twelve-to-eighteen month term promissory notes bearing 5%-8% annual interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Notes" and "FPCM Investors"), which were issued by one of Woodbridge's

5

several affiliated Fund Entities, and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC (collectively "Fund Offerings" and "Fund Investors").

### i. FPCM Notes

20. Woodbridge represented that the FPCM Notes were a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers"). Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers' real estate. For example, Woodbridge wrote in marketing materials "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

21. In truth and in fact however, Woodbridge created false promissory notes evidencing these payments from Third Party Borrowers and incorporated these documents by reference in the promissory notes provided to each investor.

22. The FPCM Investors invested their funds in a common enterprise with the expectation of earning the promised returns based on the efforts of others, while maintaining a secured interest in a parcel of real estate.

6

23. The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge and the investments were in a common enterprise. Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes. Investors had no control over how Shapiro and Woodbridge used their money. Because Woodbridge was a Ponzi scheme, its ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments. Woodbridge informed investors that it conducted all due diligence including title search and appraisal on the commercial property and supposed Third-Party Borrower. The investors played little or no role in selecting which properties would purportedly secure their investments. The Defendants also provided investors with marketing materials prepared by Woodbridge that reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

### ii. Fund Offerings

24. Woodbridge offered the Fund Offerings to investors through one of its affiliated Fund Entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors. In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

25. Woodbridge, in avoiding registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a

share of "profits."   Neither Woodbridge nor the Defendants ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

26. In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs.   The Fund Offerings, in effect, were investments into pooled FPCMs.   Many of these pools contained 40 or more investors.

27. Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others.   The allegations of paragraphs 22 and 23 of this Complaint are applicable to the Fund Offerings as well.

28. The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10).   Investors were unquestionably motivated by the high rate of returns that Woodbridge offered and investors viewed these as passive investments generating safe returns.   Woodbridge sold the FPCM Notes to a broad segment of the public (at least 8,400 investors) through general solicitations and there were no risk-reducing factors indicating the FPCM Notes were not securities.   Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

**B.  Woodbridge's Misrepresentations**

29. Woodbridge's claim that it was using investors' funds to make high interest rate loans to Third-Party Borrowers was a lie.   In reality, Woodbridge's business model was a sham.   Investors' funds were used to purchase, in the name of a Shapiro controlled Limited Liability Company (LLC), almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen,

Colorado.  Thus, nearly all the "third-party" borrowers were Shapiro owned and controlled shell company LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

30. Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal.  For the payment of returns to FPCM and Fund Investors and redemptions to FPCM Investors who did not rollover their notes, Woodbridge raised and used new investor funds, in classic Ponzi scheme fashion.

31. Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities.  Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

32. In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, took the position that the FPCM Investors do not have a secured interest in the property underlying their investment because they were required to perfect their interest pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

**C.   The Defendants Offered and Sold Securities in Unregistered Transactions**

33. From at least November 2012 to December 2016, the Defendants offered and sold Woodbridge's securities and Ironbridge Funds' securities in unregistered transactions to at least 45 investors located in at least four states.

9

34. The Defendants raised approximately $18 million from the offer and sale of Woodbridge securities, either directly to investors or indirectly though the Ironbridge Funds.  In return, the Defendants received approximately $1 million in transaction-based sales commissions from Woodbridge.

**i. Offer and Sale of Woodbridge's Securities Directly to Retail Investors**

35. From at least November 2012 to February 2015, the Defendants offered and sold Woodbridge securities in unregistered transactions to investors. The investors, personally solicited by Pittsenbargar, were mostly elderly retirees who invested through their IRA accounts, and were not accredited or sophisticated.

36. Woodbridge provided the Defendants with the information and marketing materials that the Defendants gave to FPCM and Fund Investors.

37. Using the Woodbridge-provided materials, information and talking points, the Defendants advertised the Woodbridge securities via the internet, via promotions sent via U.S. mail, by email, telephone, and through in-person meetings with investors.

38. Once in contact with a potential investor, Pittsenbargar discussed the merits of the Woodbridge investment, assured the safety and profitability of the Woodbridge investment, and reviewed Woodbridge's sales material with investors.  Pittsenbargar touted the purported safety and security of the investments because, among other things, real estate assets purportedly secured them.

39. If a customer decided to invest in the FPCM Note program, Pittsenbargar completed a Woodbridge online form identifying the customer and selecting the property the customer wanted as collateral with the minimum investment of $25,000 (or Pittsenbargar called Woodbridge directly to get this

done by telephone, usually relying on a Woodbridge executive to select the property).  Woodbridge's processing department then generated a loan agreement and promissory note and sent the documents to Pittsenbargar.  The investor signed these documents, provided a check for his or her principal investment, and Pittsenbargar returned the package to Woodbridge.  The investor then received monthly interest payments directly from Woodbridge.

40. Woodbridge offered its FPCM Notes to the Defendants at a 9% wholesale annual interest rate, who then would offer these notes to their investor clients at 5% to 8% annual interest rate—the difference representing the Defendants' transaction-based commissions.

41. For the Fund Offerings, the Defendants received a 5% sales commission that Woodbridge purposefully mischaracterized as a "marketing bonus" to avoid the appearance of paying transaction-based commissions to unregistered sales agents.

**ii. Offer and Sale of Woodbridge's Securities Through Ironbridge Funds**

42. From approximately February 2015 until December 2016, the Defendants continued to offer and sell Woodbridge's securities, but through the Ironbridge Funds.  Pittsenbargar formed Ironbridge Fund 1 in January 2015 and Ironbridge Fund 2 in July 2015.  A few days after forming Ironbridge Fund 2, the state of Texas issued the 2015 TSSB Order requiring Pittsenbargar and BP Financials to cease and desist from selling securities in unregistered transactions in Texas.

43. Pittsenbargar failed to disclose to investors that the state of Texas had issued a cease-and-desist order against him and BP Financials.

44. Beginning in early 2015, Pittsenbargar purchased Woodbridge securities for all ensuing clients in the name of the Ironbridge Funds instead of in

the name of the actual investor.  By purchasing the securities in the name of the Ironbridge Funds, Pittsenbargar was able to continue selling investments in Woodbridge and receiving commissions despite the 2015 TSSB Order.

45. For example, investors sent checks to Ironbridge Funds to invest in Woodbridge's FPCM and Fund Offerings and Pittsenbargar, on behalf of Ironbridge Funds, used the investors' funds to purchase Woodbridge securities in the name of Ironbridge Funds.

46. Thus, instead of receiving an interest in Woodbridge's securities, the investors in Ironbridge Funds, received Units or partial Units in Ironbridge Funds.

47. For each investment in Woodbridge through Ironbridge Funds Woodbridge paid Pittsenbargar transaction-based commissions of typically 5% of the amounts invested.

48. The Ironbridge Funds purchased more than $6 million in Woodbridge securities on behalf of investors.

**iii. Offer and Sale of Ironbridge's Securities**

49. The Defendants also sold securities in unregistered transactions through two funds Pittsenbargar controlled, Ironbridge Fund 1 and Ironbridge Fund 2.

50. The Defendants raised approximately $5 million from investors for Ironbridge Fund 1 and approximately $4 million from investors for Ironbridge Fund 2.  Of the approximately $9 million raised by the Defendants from investors for the Ironbridge Funds, the Defendants invested more than $6 million with Woodbridge and invested the remaining funds with a now-defunct company.

51. The investors in the Ironbridge Funds invested in a common enterprise with the expectation of earning profits based on the efforts of others. Once investors provided their funds to the Defendants, their funds were commingled with other investors' funds and used by the Defendants to among

12

other things, purchase Woodbridge securities.  The investors played little or no role in how the Defendants invested their funds.

52.  Although the Defendants purportedly offered Ironbridge Funds' securities under a Rule 506(b) exemption to registration, the offerings did not qualify as such because many of the investors were neither accredited nor sophisticated, a fact known to the Defendants.  In fact, the Defendants sold Ironbridge Funds' securities to unsophisticated and elderly investors without regard to their level of financial sophistication, risk tolerance, or financial stability.  Further, the Defendants, on behalf of Ironbridge Funds, did not provide an audited balance sheet or financial statements to unaccredited investors.

53.  During the time the Defendants sold Woodbridge's securities and Ironbridge Funds' securities, the Defendants held no securities licenses, were not registered with the Commission, and were not associated with a registered broker-dealer.  Further, neither Woodbridge's securities nor Ironbridge's securities were registered with the Commission and did not qualify for an exemption from registration.  The Defendants were thus not permitted to sell Woodbridge's securities or Ironbridge Funds' securities.

**COUNT I**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**[15 U.S.C. §§ 77e(a) and 77e(c)]**

54.  The Commission repeats and realleges paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55.  No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities.

56. From as early as November 2012 through December 2016, the Defendants directly and indirectly:

(a)     made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)     carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)     made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

57. By reason of the foregoing, the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 15(a)(1) of the Exchange Act

### [15 U.S.C. § 78o(a)(1)]

58. The Commission repeats and realleges Paragraphs 1 through 53 of this Complaint as if fully set forth herein.

59. From as early as November 2012 through December 2016, the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity

1    registered with the Commission as a broker-dealer.

2    60. By reason of the foregoing, the Defendants violated and, unless

3    enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the

4    Exchange Act [15 U.S.C. § 78o(a)(1)].

5    **RELIEF REQUESTED**

6    WHEREFORE, the Commission respectfully requests the Court:

7    **I.**

8    Issue findings of fact and conclusions of law that the Defendants committed

9    the violations alleged herein.

10   **II.**

11   Issue a Permanent Injunction, in a form consistent with Rule 65(d) of the

12   Federal Rules of Civil Procedure, restraining and enjoining all Defendants, their

13   agents, servants employees, and attorneys, and those persons in active concert or

14   participation  with them who receive actual notice of the injunction by personal

15   service or otherwise, and each of them, from, directly or indirectly, violating

16   Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange

17   Act.

18   **III.**

19   Issue an Order directing the Defendants to disgorge all ill-gotten gains or

20   proceeds received within the applicable statute of limitations, as a result of the

21   acts and/or courses of conduct complained of herein, with prejudgment interest

22   thereon.

23   **IV.**

24   Issue an Order directing the Defendants to pay civil money penalties

25   pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange

26   Act.

27

28

**V.**

Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court may deem just and appropriate.

**JURY DEMAND**

The Commission requests a trial by jury.

Dated:  November 25, 2019

/s/ Donald W. Searles
Donald W. Searles
Attorney for Plaintiff
Securities and Exchange Commission

16